UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUVENTINO RODARTE,

          Plaintiff,

     v.

ALAMEDA COUNTY, et al.,

          Defendants.

Case No.  14-cv-00468-KAW

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 56

On June 26, 2015, Alameda County, Sheriff Gregory J. Ahern, Deputy Sheriff Sergeant Raymond P. Kelly, and Deputy Sheriff Derek D. Thoms ("Defendants") filed a motion for summary judgment, or in the alternative, partial summary judgment.  Juventino Rodarte ("Plaintiff") opposes the motion.  The Court held a hearing on the motion on September 17, 2015. For the reasons set forth below, the motion is GRANTED.

## I.  BACKGROUND

### A.  Factual background

At 2:20 a.m. on March 23, 2013, Daniel Furtado ("Furtado") called 911 to report that he noticed his porch motion light turn on, and he heard a bang outside his front door.  (Thomas Decl., Ex. D, Furtado Dep. 36:12-14, Dkt. No. 57; Brunner Decl., Ex. D, Furtado Dep. 50:1-51:8, Dkt. No. 62.)  He feared that someone was trying to break-in to his home or his car, as someone had already attempted the former six months prior.  (*Id.* 35:15-16, 53:7-12.)

Furtado lives in a ground floor unit in the same building as Plaintiff.  (Brunner Decl., Ex. E, Sfeatcu Dep. 26:10-18; Furtado Dep. 25:16-22.)  It is the only unit with a front door that opens to the outside instead of a building hallway.  (Sfeatcu Dep. 26:10-18; Furtado Dep. 25:21-24.)

At least four Alameda County Sheriff's Deputies responded to Furtado's 911 call:  Sergeant

1    Raymond P. Kelly ("Kelly"), Deputy Derek Thoms ("Thoms"), Deputy C. Kolos ("Kolos"), and

2    Deputy T. Nelson ("Nelson").  (Thomas Decl., Ex. B, Thoms Dep. 28:10-14.)  The deputies

3    arrived at the scene at approximately 2:22 a.m.  (Brunner Decl., Ex. A, Thoms Dep. 69:9-70:6 &

4    Ex. 9 at 2-3.)  Two of them, Thoms and Kelly, had experience responding to calls in the area

5    (including the same property and surrounding apartment buildings), which ranged from

6    disturbances to domestic violence disputes, auto burglaries, and home invasions.  (Thomas Decl.,

7    Ex. B, Thoms Dep. 22:9-19; Thomas Decl., Ex. C, Kelly Dep. 19:25-20:9.)  Thoms, a K-9

8    handler, arrived at the scene with service dog Zina, who was on a six-foot leash.  (Thoms Dep.

9    23:15-16, 49:11-12.)

10       The deputies made their way to the back of the apartment complex and spoke with the

11    resident believed to be the reporting party.[1]  (Thoms Dep. 25:15-19; Kelly Dep. 21:8-25.)  The

12    resident told the officers that he saw a motion sensor light, heard noises near his vehicle, and

13    believed that someone was attempting to burglarize his car.  (Thoms. Dep. 28:21-29:2.)  The

14    resident "had a sense of urgency about his voice," and he seemed "really animated" about a

15    possible prowler.  (Kelly Dep. 30:13-23.)

16       The deputies heard footsteps and a door slam.  (Thoms Dep. 26:16-23; Kelly Dep. 23:9-22,

17    25:16-20.)  The deputies believed that the suspect was trying to evade law enforcement.  (Thomas

18    Decl., Ex. B, Thoms Dep. 38:14-17; Ex. C, Kelly Dep. 25:1-5.)  The deputies moved in the

19    direction of the noise and entered the apartment complex through an open door at back of the

20    building.[2]  (Thoms Dep. 38:14-25.)  Thoms and Zina led the way.  (Thoms Dep. 39:5-12, 78:22-

21    23; Kelly Dep. 26:1-5.)  The deputies walked through first floor, then moved to the second floor.

---

[1] Plaintiff asserts that a genuine dispute exists as to whether the deputies talked to the actual 911 caller or any other resident.  Pl.'s Opp'n at 12.  The deputies concede that they initially believed that the resident they spoke to was Furtado, but following his deposition, and the description Furtado provided of his neighbor, the deputies believe that the resident they spoke to was Furtado's neighbor.  Defs.' Mot. at 3 n.1.  Plaintiff claims that "[t]he conversation was completely fabricated by the deputies based on what appears to be an after-the-fact review of the 911 tape and the report from the deputy who took Furtado's statement long after the incident was over."  Pl.'s Opp'n at 13.

[2] Plaintiff claims that the deputies broke the locked gate in order to access the right side of the apartment complex.  Brunner Decl., Ex. A, Thoms Dep. 24:8-25:14 & Ex. 2; Brunner Decl., Ex. E, Sfeatcu Dep. 61:3-62:10.

United States District Court
Northern District of California

1   (Thoms Dep. 39:9-12; Kelly Dep. 26:15-20.)

2       The deputies eventually encountered a man, later identified as Plaintiff, sitting in the

3   alcove in front of an apartment.  (Thoms Dep. 40:18-41:1; Kelly Dep. 27:8-12.)  Plaintiff was

4   sitting on the ground, with his back against the wall, knees bent up toward his chest, with his arms

5   resting on his knees.  (Kelly Dep. 28:2-8; Thoms Dep. 42:1-2.)  His hands were in his lap and his

6   head was down with his hood pulled over his head.  (Thoms. Dep. 42:1-13; Kelly Dep. 28:2-9.)

7   Kelly observed a shiny metallic object in Plaintiff's hands.  (Thoms. Dep. 43:24-44:13; Kelly Dep.

8   29:12-13, 34:15-19.)

9       Kelly and Thoms announced their presence, shouting "Sheriff's office.  Let me see your

10  hands."  (Thoms Dep. 42:19-25; Kelly Dep. 34:19-20.)  This continued while Kelly and Thoms

11  repeatedly attempted to elicit any sort of response from Plaintiff.  (Thoms Dep. 43:9-12; Kelly

12  Dep. 36:2-5.)  Plaintiff did not respond, despite Zina's barking, but Kelly and Thoms moved

13  closer.  (Kelly Dep. 35:12, 36:13-14.)  The deputies still could not identify the metallic object in

14  Plaintiff's hands, but Kelly did see Plaintiff's eyes move.[3]  (Thoms Dep. 45:5-8, 21-24; Kelly Dep.

15  37:1-4.)

16      Kelly and Thoms feared approaching Plaintiff directly because of the unidentified object,

17  which could have been a weapon for use at close range.  (Thoms Dep. 44:25-45:4, 48:9-11; Kelly

18  Dep. 38:11-16.)  At some point, Kelly drew his gun and pointed it at Plaintiff, and Zina started

19  barking, though apparently not loud enough for the residents in Plaintiff's apartment, or those in

20  the apartment 100 feet away, to hear it.  (Brunner Decl., Ex. A, Thoms Dep. 68:1-20 & Ex. 7 at 5,

21  10, 11; Brunner Decl., Ex. F, Kelly Dep. 35:6-14, 36:1-7; Brunner Decl., Ex. C, Pitol Dep. 23:17-

22  23; Brunner Decl., Ex. E, Sfeatcu Dep. 56:15-20.)

23      The deputies gave Plaintiff a final warning that the service dog would be deployed unless

24  he cooperated.  (Thoms Dep. 48:24-49:2.)  When Plaintiff did not respond, Thoms deployed Zina,

25

26  _____

27  [3] According to Plaintiff, "[a]lthough Kelly reported that he could see Mr. Rodarte's eyes, Thoms
    and Nelson did not see his eyes and Deputy Thoms was closest to Mr. Rodarte."  Pl.'s Opp'n at 6.
    In his complaint, Plaintiff alleges that he "saw service dog Zina's face and the knee of a person,"
28  and that he "became paralyzed and frozen with fear as he concentrated on service dog Zina's face."
    Comp. ¶¶ 18, 19.

1    but only after the deputies considered and eliminated using other means of force such as batons,

2    pepper spray, and Tasers. [4]  (*Id.* 46:8-49:12; Kelly Dep. 38:1-39:21.)  Thoms kept hold of the six-

3    foot leash, and on his command, Zina bit Plaintiff on his left lower leg.  (*Id.* 49:3-5.)  Once Zina

4    bit Plaintiff, the officers were able to see that Plaintiff was holdings his keys.  (*Id.* 49:6-16.)

5        Plaintiff was handcuffed without further incident and cited for violation of California Penal

6    Code section 148(a).  (*Id.* 49:22-50:7.)  He was transported to the hospital, where Thoms

7    interviewed him.  (*Id.* 50:5-7, 55:19-23, 56:22-57:4, 61:3-20.)  At some point, the deputies learned

8    that Plaintiff was sitting in the alcove of his own apartment.  (Thomas Decl., Ex. B, Thoms Dep.

9    52:16-53:5.)

10       According to Plaintiff, he had just returned home from a barbeque he attended with some

11   co-workers.  (Brunner Decl., Ex. B, Rodarte Dep. 65:15-20, 66:15-17, 67:4-13, 68:25-69:5.)  A

12   co-worker had driven Plaintiff to work that day and given him a ride to the barbeque.  (*Id.* 66:22-

13   25, 67:8-13, 69:3-5, 72:11-13.)  Plaintiff drank beer at the barbeque for approximately five and a

14   half to six hours, and by the time he returned home, he was drunk.  (*Id.* 69:13-70:1, 70:23-24.)

15   Plaintiff rarely has more than one drink in a single sitting, partly because he works nights.

16   (Brunner Decl., Ex. C, Pitol Dep. 39:2-17.)

17       Plaintiff arrived at approximately 2:00 a.m.  (Rodarte Dep. 65:15-20.)  His coworker drove

18   him home and dropped him off in front of his apartment building.  (*Id.* 69:23-70:1, 72:11-19.)

19   Plaintiff entered through the front of the building and walked to his apartment.  (*Id.* 73:3-10,

20   73:21-23.)  Once there, he decided he wanted a cigarette, so he went downstairs and exited

21   through the back door that led to the parking lot.  (*Id.* 74:12-25.)  He retrieved a cigarette from

22   the trunk of his car and smoked for about ten minutes.  (*Id.* 77:12-16, 77:23-25, 78:8-10.)

23       Plaintiff returned to his apartment, but he did not want his wife to see him drunk, so he sat

24   in the alcove.  (*Id.* 79:4-6, 79:11-14, 80:25-81:3.)  He sat with his back to the wall, his knees to his

---

[4] Among other things, the deputies considered and eliminated baton strikes because that would
have required them to move closer to Plaintiff, which would have placed them at risk given the
unidentified metallic object in his hand.  Defs.' Mot. at 14.  The deputies considered and
eliminated the use of a Taser based on Plaintiff's body position.  *Id.*  The officers also considered
and eliminated the use of pepper spray because Plaintiff was wearing a hood and concealing his
face.  *Id.*

United States District Court
Northern District of California

1    chest, and his head down on his hands, which were placed on his knees.  (*Id.* 8:25-82:4.)  He had

2    the keys to his apartment in his right hand.  (*Id.* 82:5-8.)  He may have fallen asleep while he was

3    sitting in front of his apartment, and he remembers sitting there for about 10 minutes before he

4    was bitten.  (*Id.* 83:15-84:5.)

5           Thoms and Kelly did not observe any signs of intoxication at the time of the incident.

6    (Kelly Dep. 47:13-21; Thoms Dep. 50:8-24.)  Plaintiff states that the video recordings of Thoms'

7    hospital interviews show that Plaintiff was visibly intoxicated.  (Brunner Decl., Ex. A, Thoms

8    Dep. 58:24-59:8; Brunner Decl., Ex. J, Hospital Interview.)  Kelly testified at his deposition that

9    "[b]ased on our conversations with Mr. Rodarte after, at the hospital, around that time, we came of

10   the opinion, based on our training, experience, that he had possibly been drunk driving and that

11   might have been the reason that he had kind of hidden from us and didn't comply with us."

12   (Brunner Decl., Ex. F, Kelly Dep. 52:19-54:10.)  Kelly also testified that if he had been able to

13   "link [Plaintiff] to a DUI and put him in the driver's seat of that car," he would have charged him

14   with a DUI.[5]  (*Id.* 53:13-54:10.)

15          **B.      Procedural background**

16          On January 30, 2014, Plaintiff filed his complaint against Alameda County (the "County"),

17   Sheriff Gregory J. Ahern ("Ahern"), Kelly, and Thoms.[6]  (Compl., Dkt. No. 1.)  He asserts the

18   following causes of action:  (1) a § 1983 claim for violation of his Fourth Amendment right to be

19   free from unwarranted seizure; (2) a § 1983 claim for violation of his Fourth Amendment right to

20   be free from excessive force; (3) a § 1983 claim for violation of his Fourth Amendment right to be

21   free from unlawful arrest; (4) a claim under § 1983, *Monell v. Dept. of Social Services*, 436 U.S.

22   658 (1978), and *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) based on (a) an alleged

23   policy or custom of allowing officers to deploy service dogs in circumstances where innocent third

24

25   [5] In the police report, Deputy Thoms wrote:  "During the interview RODARTE stated several

26   times that he had not been driving.  It was my belief that RODARTE had driven home intoxicated
     and believed we were attempting to arrest him for his third DUI, which is why he was not

27   complying with our orders."  Thoms Dep., Ex. 7 at 8.

28   [6] Ahern, Kelly, and Thoms are sued in their individual capacities.  *See* Compl. ¶¶ 6-8.

parties or bystanders could be in harm's way, (b) an alleged failure to properly train, supervise, monitor, and control deputy sheriffs' proper use of service dogs, and (c) an alleged ratification of Kelly's and Thoms' conduct and decision-making by failing to take remedial measures and by failing to adequately discipline them;[7] (5) assault and battery; (6) intentional infliction of emotional distress; (7) violation of the Tom Bane Civil Rights Act, California Civil Code section 52.1; (8) negligence per se based on California Civil Code section 3342, and (9) negligence.[8] (*Id.* ¶¶ 45-46, ¶¶ 47-48, ¶¶ 49-50, ¶¶ 51-58, ¶¶ 59-65; ¶¶ 66-70, ¶¶ 71-77, ¶¶ 78-84, ¶¶ 85-94.)

On June 26, 2015, Defendants moved for summary judgment, or in the alternative, partial summary judgment. (Defs.' Mot. Summ. J. ("Defs.' Mot."), Dkt. No. 56.)  Plaintiff filed his opposition to the motion on July 10, 2015.  (Pl.'s Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Opp'n"), Dkt. No. 61.)  Defendants filed their reply on July 17, 2015.  (Defs.' Reply in Support of Mot. Summ. J. ("Defs.' Reply"), Dkt. No. 63.)

On July 27, 2015, the Court approved the parties' stipulation to continue the original August 6, 2015 hearing date to September 3, 2015.  (Stip. & Order, Dkt. No. 70.)  On August 31, 2015, the Court ordered Plaintiff to file a sur reply in response to two issues Defendants raised for the first time in their reply.  (Aug. 31, 2015 Order, Dkt. No. 74.)  Specifically, Plaintiff was to address (1) why the Court should not strike, from Plaintiff's opposition, any reference or evidence that contradicts the judicial admissions found in paragraphs 18 and 19 of the complaint and (2) why his Bane Act claim can survive even though he claims to have been unresponsive and sleeping in front of the door to his apartment when Defendants deployed the service dog.  (Aug. 31, 2015.)  After Plaintiff timely filed his sur reply, the Court held a hearing on Defendants' summary judgment motion on September 17, 2015.  At the hearing, the parties conceded that the

---

[7] Plaintiff has captioned the first four claims as arising under the Fourth and Fourteenth Amendments, though he has briefed the claims only to the extent they concern the Fourth Amendment.  Accordingly, the Court applies that standard in ruling on the instant motion.

[8] In his opposition, Plaintiff concedes that he cannot maintain his *Monell* claim (fourth cause of action), which is asserted against the County and Ahern, "as no evidence is available to indicate that defendants' policies or practices sanction attacking an unresponsive person, who poses no threat, with a police service dog."  Pl.'s Opp'n at 7.  He also concedes that he cannot maintain his claims for intentional infliction of emotional distress (sixth cause of action) and for negligence per se (eighth cause of action).  *Id.*

United States District Court
Northern District of California

1    facts in this case are largely undisputed.

2    **II.    LEGAL STANDARD**

3        "A party may move for summary judgment, identifying each claim or defense - or the part

4    of each claim or defense--on which summary judgment is sought."  Fed. R. Civ. P. 56(a).

5    Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to

6    material facts and the moving party is entitled to judgment as a matter of law.  *Id.*; *see Celotex*

7    *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Material facts are those that might affect the

8    outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a

9    material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

10   the nonmoving party.  *Id.*

11       A party seeking summary judgment bears the initial burden of informing the court of the

12   basis for its motion and of identifying those portions of the pleadings and discovery responses that

13   demonstrate the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  Where the

14   moving party will have the burden of proof at trial, it must affirmatively demonstrate that no

15   reasonable trier of fact could find other than for the moving party.  *Southern Calif. Gas. Co. v.*

16   *City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

17       On an issue where the nonmoving party will bear the burden of proof at trial, the moving

18   party may discharge its burden of production by either by (1) "produc[ing] evidence negating an

19   essential element of the nonmoving party's case" or (2) after suitable discovery, "show[ing] that

20   the nonmoving party does not have enough evidence of an essential element of its claim or defense

21   to discharge its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd., v.*

22   *Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000); *see also Celotex*, 477 U.S. 324-25.

23       Once the moving party meets its initial burden, the opposing party must then set forth

24   specific facts showing that there is some genuine issue for trial in order to defeat the motion.  *See*

25   Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250.  "A party opposing summary judgment may not

26   simply question the credibility of the movant to foreclose summary judgment."  *Far Out Prods.,*

27   *Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).  "Instead, the non-moving party must go beyond

28   the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue

United States District Court
Northern District of California

7

for trial." *Id.* (citations and quotations omitted).  The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).  Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.  *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

### III.    DISCUSSION

**A.    Objections to evidence**

In their reply, Defendants move to strike any and all arguments that Plaintiff was "asleep, passed out, etc."  (Defs.' Reply at 3.)  Defendants also move to strike Plaintiff's deposition testimony at pages 69:13-70:1, 70:23-24, 83:15-84:5.  (*Id.*)  That testimony is as follows:

> 13 Q. Did you drink any alcoholic beverages at the
> 14 barbecue?
> 15 A. Yes.
> 16 Q. What, beer?
> 17 A. Yes.
> 18 Q. Anything else?
> 19 A. No, just that.
> 20 Q. How many -- or how long did you stay at the
> 21 barbecue?
> 22 A. For six hours. Five and a half, six hours.
> 23 Q. When you left there, did you get dropped off at
> 24 home or was there a stop?
> 25 A. They took me home. They took me straight home
> 1 after the barbecue.
>
> . . .
>
> 23 Q. Did you get drunk?
> 24 A. Yeah.
>
> . . .
>
> 15 Q. Did you fall asleep while you were sitting down
> 16 in front of your apartment?
> 17 A. Possibly.
> 18 Q. Do you remember falling asleep?

United States District Court
Northern District of California

19 A. No.
20 Q. Did you pass out while you were sitting in
21 front of your apartment?
22 A. While I was sitting?
23 Q. Yes.
24 A. No. I don't remember.
25 Q. So after you sat down, do you remember being
1 seated for a period of time before you were bitten?
2 A. Yes.
3 Q. Can you estimate how long you were seated
4 before you were bitten?
5 A. Ten minutes.

Brunner Decl., Ex. B., Rodarte Dep., 69:13-70:1, 70:23-24, 83:15-84:5.)

Defendants assert that this testimony lacks foundation, is speculative, and contradicts the allegations in the complaint, which are binding judicial admissions under *American Title Insurance Company v. Lacelaw Corporation*, 861 F.2d 224, 226 (9th Cir. 1988).

In his sur reply, Plaintiff concedes that "the pleadings filed in a case are considered judicial admissions and 'unless amended, are considered judicial admissions conclusively binding on the party who made them.'" (Pl.'s Sur Reply at 2, Dkt. No. 77 (citation omitted).) Nonetheless, Plaintiff argues that his motion for leave to amend the complaint, filed contemporaneously with his sur reply, moots the issue. (*Id.* at 2.) This argument fails because the Court has denied that motion. (September 15, 2015 Order, Dkt. No. 91.)

Alternatively, Plaintiff argues that certain excerpts from his deposition need not be stricken because they do not contradict his allegations that he "saw service dog Zina's face and the knee of a person," and that he "became paralyzed and frozen with fear as he concentrated on service dog Zina's face." (Pl.'s Sur Reply at 4.) Specifically, Plaintiff argues that his testimony (1) that he had been drinking, (2) that he had become intoxicated, and (3) that he had been sitting in front of his apartment for approximately ten minutes before he was bitten do not contradict any of the allegations in the complaint. (*Id.*)[9]

---

[9] In his sur reply, Plaintiff also requests that the Court strike any evidence suggesting that the deputies spoke to any resident other than Furtado. Sur Reply at 4, 5. As explained below, whether the deputies spoke to anyone at the scene is immaterial in light of the 911 call that prompted their investigation.

The Court finds that the testimony suggesting that Plaintiff may have fallen asleep or passed out contradicts his allegations that he saw the service dog and was paralyzed with fear, allegations which necessarily presuppose his being awake.  Accordingly, the testimony at page 83:15-17 is stricken, and any argument based on that testimony is stricken from Plaintiff's opposition.  This includes the argument that Plaintiff was too intoxicated to respond to the officer's commands.  In Plaintiff's own words, he "was paralyzed and frozen with fear."  (Compl. ¶ 19.)[10] He cannot now advance the theory that he was unresponsive because he was too intoxicated to respond.  In any event, this theory is unsupported by admissible evidence.  To this limited extent, Defendants' objections are sustained, and the testimony at page 83:15-17 is stricken.  The objections are otherwise overruled.

## B.    Federal claims

"Section 1983 provides a cause of action against any person who, under the color of state law, abridges rights unambiguously created by the Constitution or laws of the United States. . . . [It] is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  *Crowley v. Nevada*, 678 F.3d 730, 734 (9th Cir. 2012) (internal quotations and citations omitted).  Thus, to state a claim under § 1983, a plaintiff must allege two elements:  (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).

### 1.    Unwarranted seizure

Plaintiff's first § 1983 claim, asserted against Kelly and Thoms, is for violation of his Fourth Amendment right to be free from unwarranted seizure.  (Compl. ¶¶ 45-46.)

"Whenever an officer restrains the freedom of a person to walk away, he has seized that person."  *Tennessee v. Garner,* 471 U.S. 1, 7 (1985).  A seizure is unreasonable under the Fourth

---

[10] Indeed, when interviewed at the hospital after the incident, Plaintiff acknowledged that he heard the deputies identifying themselves and announcing their presence.  Brunner Decl., Ex. J.  At the hearing, Plaintiff challenged the validity of this admission, though he initially introduced the videotape to establish his intoxication.  Pl.'s Opp'n at 14 ("[I]n the video recorded by Deputy Thoms in the hospital, Mr. Rodarte is clearly visibly intoxicated and incoherent.").

United States District Court
Northern District of California

Amendment if it constitutes an arrest, made without probable cause, or a detention, short of arrest, made without reasonable suspicion. *Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001); *Florida v. Royer*, 460 U.S. 491, 498 (1983).  An officer may detain an individual, short of arrest, if the detaining officer has an "articulable suspicion that a person has committed or is about to commit a crime." *Royer*, 460 U.S. at 498.  Reasonable suspicion requires the officer to identify "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1986) (footnote omitted); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) (holding that "the totality of the circumstances—the whole picture—must be taken into account" when determining if an officer had reasonable suspicion to perform an investigatory stop).

The reasonable suspicion standard "is a less demanding standard than probable cause, and merely requires a minimal level of objective justification." *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002) (quotations and citations omitted).  When detaining a person under *Terry,* a police officer is entitled to conduct a limited investigation to determine if the person was involved in criminal activity.  *See United States v. Hensley*, 469 U.S. 221, 229 (1985).

Defendants argue that there was reasonable suspicion to detain Plaintiff because Furtado reported a possible burglary in progress, the deputies knew that the location had a history of disturbances requiring police intervention, and the deputies spoke to a resident at the scene who confirmed hearing noises and seeing a motion light turn on and who was noticeably concerned about the risk of a possible prowler.  (Defs.' Mot. at 10.)  Defendants claim that while the deputies spoke to the resident, they heard footsteps and a door slam and believed that the suspect had entered the building to evade law enforcement.  (*Id.*)  When the deputies came across Plaintiff, the only person they encountered in the building, his bizarre behavior led the officers to conclude that he was the suspected burglar.  (*Id.*)

In opposition, Plaintiff argues that the 911 call did not provide Defendants with reasonable suspicion to detain Plaintiff.  (Pl.'s Opp'n at 11.)  Plaintiff asserts that the officers were not informed that someone was trying to enter the building or that a burglary was in progress, but rather, the officers were merely dispatched to a "prowler" call.  (*Id.*)  He maintains that these facts

United States District Court
Northern District of California

do not "illustrate any criminal activity" in a large apartment building with twenty-two units and in the area, accessible to all tenants, that serves as the path from the back door of multiple residences to the parking lot—the same path the deputies purportedly used to enter the complex. (*Id.*) Plaintiff also highlights that the officers testified that they did not observe any signs of anyone breaking-in to cars or of any other criminal activity. (*Id.* at 11-12.) Plaintiff also disputes whether the deputies spoke to anyone at the scene, as the deputies first claimed that they spoke to Furtado and later claimed that they must have spoken not to Furtado, but to a neighbor. (*Id.* at 13.)

Plaintiff further challenges the deputies' testimony that they heard footsteps and the sound of a door slamming. (*Id.* at 12.) Plaintiff explains that the building is locked and secured and so a person entering the building is not likely to be an intruder trying to avoid police but a resident with keys and access to the interior of the building. (*Id.*) He further argues that there exists a disputed fact as to whether the officers even heard a door slam, because Plaintiff testified that he entered the building as least ten minutes before the officers did and sat down in front his apartment for about this length of time, and the officers testified that when they saw the door, it was ajar. (*Id.*)

Plaintiff's arguments are unpersuasive. In advancing the argument that the 911 call could not have provided the deputies with the reasonable suspicion necessary to detain him, Plaintiff relies on *United States v. Toms*, 163 Fed. App'x 460 (9th Cir. 2005), an unpublished decision he claims is persuasive here. In that case, an officer responded to a 911 call by an informant who was neither the victim of a crime nor an insider with information about criminal activity. (*Id.* at 461 (citation omitted).) Instead, the informant was a Rite Aid store manager, who was concerned about a man sitting in a car with no license plates in the parking lot of her store. (*Id.* (citation omitted).) Other than the car having no license plates, the report contained no information that was objectively suspicious. (*Id.* (citation omitted).) An officer arrived at the scene and seized the occupant of the vehicle, though he had not corroborated the details in the informant's report. (*Id.*) At the time of the detention, the officer had only observed "'a black Honda Civic backed in by the front of the door of the Rite Aid with an unknown black male sitting kind of low in the driver's seat.'" (*Id.*) On appeal, the Ninth Circuit determined that this was insufficient to give rise to reasonable suspicion that the defendant had engaged in illegal activity. (*Id.*) On that basis, it

12

1    reversed the district court's denial of the defendant's motion to suppress, vacated the conviction,

2    and remanded the case for further proceedings.  (*Id.* at 461-462.)

3         Here, however, Furtado called 911 at 2:20 a.m.  He saw his motion light turn on, and he

4    heard a loud bang outside his front door.  He feared that someone was trying to break-in to his

5    home or his car, the former of which had occurred six months prior.  Combined with the officer's

6    training and experience in responding to 911 calls in the area, Furtado's call provided information

7    suggesting that criminal activity was afoot, which warranted a limited investigation.

8         While conducting that limited investigation at the scene, the deputies heard footsteps and a

9    door slam.  The officers moved in the direction of the sounds, believing that the suspect was trying

10   to evade law enforcement, and entered the complex.  As they moved through the complex, the

11   only person they encountered was Plaintiff.  Even when viewing these facts in the light most

12   favorable to Plaintiff, the facts gave the deputies reasonable suspicion to detain Plaintiff to

13   determine whether he was the suspected prowler.

14        Plaintiff's attempt to create a genuine dispute as to whether the officers heard footsteps and

15   a door slam does not disturb this analysis.  He has not cited to any evidence in the record that

16   rebuts the deputies' testimony that they heard footsteps and a door slam.  While Plaintiff advances

17   several arguments to suggest that the deputies' testimony may not be accurate, they fall short of

18   establishing that the deputies, while at the scene, could not have possibly heard any footsteps or

19   the sound of a door slamming.  If anything, Plaintiff's testimony that he arrived at his apartment 10

20   minutes prior to the deputies' arrival, when viewed in the light most favorable to him, merely

21   establishes that when the deputies heard footsteps and a door slam, the noises could not have been

22   made by Plaintiff.  It does not establish that the deputies did not hear those sounds at all.  At the

23   hearing, Plaintiff stated that a reasonable jury could conclude that the officers were simply making

24   this up.  This is insufficient.

25        Plaintiff's attempt to create a genuine dispute about whether the deputies interviewed

26   anyone at the scene also fails.  Plaintiff does not cite a single case in support of the proposition

27   that such a dispute precludes summary judgment here.  To the contrary, *United States v. Terry-*

28   *Crespo*, 356 F.3d 1170, 1173 (9th Cir. 2004), a case Plaintiff cites in his brief, defeats his position.

United States District Court
Northern District of California

In that case, a criminal defendant moved to suppress a handgun as well as other physical evidence and statements, arguing that the 911 calls leading to his arrest constituted anonymous tips that could not furnish the police with reasonable suspicion to justify a pat-down.  The Ninth Circuit explained:

> [The] 911 call prior to the Terry stop was entitled to greater reliability than a tip concerning general criminality because the police must take 911 emergency calls seriously and respond with dispatch. . . .  Calls to 911 . . . involve exigent situations that may limit the police's ability to gather identifying information. . . .  Police delay while attempting to verify an identity or seek corroboration of a reported emergency may prove costly to public safety and undermine the 911 system's usefulness. We do not believe that the Constitution requires that result.

*Id.* at 1176.  Here, then, Furtado's 911 call, when considered alongside the deputies' training and experience with responding to calls in the area, gave the officers reasonable suspicion to conduct a limited investigation.  When, in the course of that investigation, the only person they encountered was Plaintiff, sitting outside of an apartment in a high-crime area at 2:00 a.m., the facts known to the officers at the time gave them reasonable suspicion to detain him.

Accordingly, even when viewing the evidence in the light most favorable to Plaintiff, Defendants are entitled to summary judgment on Plaintiff's § 1983 claim for violation of his Fourth Amendment right to be free from unwarranted seizure.

> ### 2.   Excessive force

Plaintiff's second § 1983 claim, brought against Kelly and Thoms, is for violation of his Fourth Amendment right to be free from excessive force.  (Compl. ¶¶ 47-48.)

The Fourth Amendment requires that officers use only such force as is "objectively reasonable" under the totality of the circumstances.  *See Graham v. Connor,* 490 U.S. 386, 396-97 (1989).  This "'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"  *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (quoting *Graham*, 490 U.S. at 388).  In assessing the nature and quality of the intrusion, courts assess the type and amount of force inflicted.  *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003) (citation omitted).  When examining the governmental interests at stake, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

United States District Court
Northern District of California

14

officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Reasonableness is viewed from the perspective of an officer on the scene, and without the benefit of 20/20 hindsight, as "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

The Ninth Circuit has "held that although reasonableness is normally a jury question, defendants can still win on summary judgment if the district court concludes after resolving all facts in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Alexander v. Cty. of Los Angeles,* 64 F.3d 1315, 1322 (9th Cir. 1995) (internal quotations and citations omitted).

Defendants characterize the force of a K-9 bite as intermediate level force. (Defs.' Mot. at 14.) They claim Zina was given a single "bite" command and a "release" command as soon as Plaintiff was in handcuffs. (Kelly Dep. 42:25-43:2.) The bite was "of short duration and not overly severe." (Defs.' Opp'n at 14.) It did not require surgery. (Rodarte Dep. 108:17-19.)

As to the severity of the crime at issue, Defendants contend that Plaintiff was suspected of burglary or attempted burglary, a possible felony. (Defs.' Mot. at 14.) Defendants argue that Plaintiff posed a risk to their safety because they observed a metallic object in his hands, which could have been a screwdriver, a knife, or some other tool used for burglarizing cars, and which could have been used as a weapon at close range. (*Id.*) Defendants also argue that Plaintiff was actively resisting arrest by failing to comply with their requests and commands. (*Id.*)

Taking the evidence in the light most favorable to Plaintiff, the intrusion on Plaintiff's Fourth Amendment rights was substantial.[11] He asserts that the deputies' descriptions of the dog bite differ—one deputy testified that when the dog bit Rodarte he bent forward onto his hands and knees; the other deputy testified that the dog dragged Rodarte out of the alcove by the leg and onto his back. Under either account, the deputies' use of police K-9, though classified as intermediate force, was considerable.

---

[11] Plaintiff asserts that photos of his leg show extensive scarring indicating that the service dog bit him multiple times. It's unclear how Plaintiff is able to draw that conclusion.

United States District Court
Northern District of California

United States District Court
Northern District of California

The crime at issue in this case, however, was not severe.  Because the record does not support the contention that there was probable cause to suspect Plaintiff of burglary, at worst, the crime at issue was a non-violent violation of California Penal Code section 148(a).  *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (trespassing and obstructing a police officer were not severe crimes and provided little, if any, basis for the officer's use of physical force).

The record also does not reveal that Plaintiff fled from the deputies.  When the deputies encountered Plaintiff and the deputies announced their presence, Plaintiff remained seated, he did not move or attempt to flee.  It is undisputed, however, that Plaintiff did not comply with the deputies' commands.  He was awake, he saw the service dog's face, and he saw someone's knee, yet he did not respond to the deputies.

With respect to the most important *Graham* factor—whether the suspect poses an immediate threat to the safety of the officers or others—Plaintiff argues:

> There is also a dispute about the deputies' claim that Mr. Rodarte posed a threat to the deputies. The deputies claim that they could see a shiny object in Mr. Rodarte's hand that later turned out to be his keys. However, Mr. Rodarte's key chain is rather big, including multiple keys and a car alarm device.  Deputy Kelly claims to have seen the shiny object, but Deputy Thoms, who was the closest to Rodarte, could not.  The deputies claim that they did not have their flashlights out making it harder to see the keys, but according to the tape of Furtado's 911 call when the deputies pass by his apartment he can see flashlights. The deputies also claim that they were afraid Rodarte had a knife or a gun and that he was going to use it on them. However, this claim is disputed by the fact that the deputies testified that they stood ten feet or fewer away from Rodarte in a tight hallway yelling at him for more than a minute.

(Pl.'s Opp'n at 16.)  These arguments miss the mark.

At the time the deputies encountered Plaintiff, they did not know that the observed object was Plaintiff's house keys.  This, then, is not material, as facts unknown to the deputies at the time do not factor into the analysis.  *See Graham*, 490 U.S. at 396.  Plaintiff does not cite to the record to support his assertion that his key chain is rather big, includes multiple keys, and a car alarm device, and at the hearing, he conceded that this was just argument.  This is thus insufficient to create a genuine dispute of material fact as to whether the deputies should have known that the shiny metallic object was Plaintiff's keys.  The supposed fact that Deputy Thoms, who was closest to Plaintiff, could not see a shiny metallic object does not rebut Deputy Kelly's testimony that he

United States District Court
Northern District of California

did observe such an object.[12]  This purported dispute, like the purported dispute about whether the deputies had their flashlights and whether they were afraid that Plaintiff had a knife or a gun, at best, go to the deputies' credibility.  As Defendants argue, however, unfounded credibility attacks are insufficient to defeat summary judgment.  *See Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (In an action based on a constitutional claim that requires proof of improper motive, "the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive."); *see also Far Out Prods., Inc.*, 247 F.3d at 997 ("A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment.").

Plaintiff does not dispute that he was holding his keys in his hand.  He judicially admits that he saw the knee of a person and the service dog's face.  It is undisputed that he did not comply with the deputies' commands.  Plaintiff also does not dispute that the deputies performed a use of force analysis, and eliminated less intrusive means of force, prior to deploying Zina, and they did so only after giving a warning.  This undisputed evidence supports the deputies' beliefs that they feared Plaintiff would use the metallic object in his hands against the deputies.

Under the totality of the circumstances, Plaintiff's bizarre behavior and his non-compliance, the deputies' beliefs that Plaintiff was armed, and the deputies' consideration and elimination of less intrusive means of force establishes that the deputies' use of force was not unreasonable.  While Plaintiff invites the Court to second-guess the officers' conduct based facts unknown to them at the time and his empty assertion that the deputies might be lying about what they saw or what they believed, the Court declines to do so.

For these reasons, Defendants' motion for summary judgment is granted as to Plaintiff's § 1983 claim for violation of his Fourth Amendment right to be free from excessive force.

---

[12] The basis for this argument is unclear.  When asked "And you just saw something shiny in his hands?," Deputy Thoms replied, "Yeah, something that was obviously metal or metal color." Thoms Dep. 44:12-13.  One of the other responding deputies, Deputy Nelson, also testified that he saw something "[l]ike a shiny metal object" in one of Plaintiff's hands.  Brunner Decl., Ex. G, Nelson Dep. 27:12-13.

United States District Court
Northern District of California

3.     <u>Unlawful arrest</u>

Plaintiff's third § 1983 claim, asserted against Thoms, is for violation of his Fourth Amendment right to be free from unlawful arrest.  (Compl. ¶¶ 49-50.)

"Under the Fourth Amendment, a warrantless arrest requires probable cause."  *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers,* 452 U.S. 692, 700 (1981)).  Probable cause exists "when 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'"  *Lopez,* 482 F.3d at 1072 (quoting *United States v. Smith,* 790 F.2d 789, 792 (9th Cir. 1986)).  While conclusive evidence of guilt is not necessary to satisfy this standard, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough."  *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Henry v. United States,* 361 U.S. 98, 101 (1959)).  "Probable cause is lacking if the circumstances relied on are susceptible to a variety of credible interpretations not necessarily compatible with nefarious activities."  *Gasho v. United States,* 39 F.3d 1420, 1432 (9th Cir. 1994) (citations omitted).

"Probable cause must be determined at the time the arrest is made.  Facts learned or evidence obtained as a result of a stop or arrest cannot be used to support probable cause unless they were known to the officer at the moment the arrest was made."  *Allen v. City of Portland,* 73 F.3d 232, 236 (9th Cir. 1995) (citation omitted).  "Where the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury."  *Harper v. City of Los Angeles,* 533 F.3d 1010, 1022 (9th Cir. 2008) (citing *McKenzie,* 738 F.2d at 1008).

Defendants argue that there was probable cause to arrest Plaintiff for burglary in violation of California Penal Code section 459 and for willfully failing to comply with officer commands in violation of California Penal Code section 148(a).  (Defs.' Mot. at 10, 11; Defs.' Reply at 8.)

California Penal Code section 459 defines burglary as entering a building with the intent to commit grand or petit larceny or any felony.  California Penal Code section 148(a) provides that a person "who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . shall be [guilty of a

1    misdemeanor]."  Cal. Penal Code § 148(a)(1).  While section 148(a)(1) is "often referred to as a

2    statute prohibiting 'resisting arrest' . . . the statutory prohibition is much broader than merely

3    resisting arrest."  *Hooper v. Cty. of San Diego,* 629 F.3d 1127, 1130 (9th Cir. 2011).  The elements

4    of the crime are: "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2)

5    when the officer was engaged in the performance of his or her duties, and (3) the defendant knew

6    or reasonably should have known that the other person was a peace officer engaged in the

7    performance of his or her duties."  *Yount v. City of Sacramento,* 43 Cal. 4th 885 (2008) (internal

8    quotations and citation omitted).

9         Plaintiff argues that the deputies did not have probable cause to arrest Plaintiff because no

10   facts indicated that a burglary had been committed and because being physically unable to respond

11   is not a crime.  (Pl.'s Opp'n at 13-14.)  He asserts that the only information available to the

12   deputies was scant, i.e., someone called 911 to report that they heard a noise and a motion light

13   went on in a common area, the deputies heard someone enter the building but saw no signs that the

14   entry was accomplished by force or by someone without legal access to the building, and they

15   observed Plaintiff sitting in the alcove of an apartment and completely unresponsive.  (*Id.* at 14.)

16        Additionally, Plaintiff argues that a genuine dispute exists as to whether the deputies knew

17   Plaintiff was too intoxicated to respond to their commands.  (Pl.'s Opp'n at 14, 15.)  He challenges

18   the deputies testimony that they were unaware Plaintiff was intoxicated at the time of the incident.

19   (*Id.* at 14.)  He claims that he is a light drinker, was extremely drunk after he spent the evening

20   drinking with his coworkers, and was unable to respond to the officers as he sat, passed out, on the

21   floor in front of his apartment.  (*Id.*)  According to Plaintiff, the recorded hospital interview shows

22   that he was visibly intoxicated and incoherent.  (*Id.*)  Plaintiff also highlights Kelly's testimony

23   that if he "could have linked [Plaintiff] to a DUI and put him in the driver's seat of that car," he

24   would have charged him with a DUI.  (*Id.*)

25        Plaintiff's argument that the deputies lacked probable cause to arrest Plaintiff for burglary

26   is well-taken.  Nothing in the record supports this theory of probable cause.  As Defendants

27   concede in their reply, "the officers arrested Plaintiff after being dispatched to the property based

28   upon a report of a prowler."  (Defs.' Reply at 4.)

The undisputed evidence in the record does, however, support the argument that the deputies had probable cause to arrest Plaintiff for violation of California Penal Code section 148(a).  As discussed above, the allegations in the complaint, which indicate that Plaintiff was awake during the incident, preclude him from arguing that he was too intoxicated to respond to the deputies' commands.  Even so, the evidence in the record indicates that the deputies came to suspect that Plaintiff might have been intoxicated after they spoke to him at the hospital, not during the incident.  There is, then, no genuine dispute that when the deputies encountered Plaintiff, he was awake but did not comply with any commands or requests even after the deputies' identified themselves.[13]  This interfered with the deputies' investigation of a possible prowler and gave them probable cause to arrest Plaintiff for violation of California Penal code section 148(a).  *Cf. People v. Quiroga*, 16 Cal. App. 4th 961, 966 (1993) ("It is true that he complied slowly with Officer Stefani's orders, but it surely cannot be supposed that Penal Code section 148 criminalizes a person's failure to respond with alacrity to police orders.").

Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's third cause of action for violation of his Fourth Amendment right to be free from unlawful arrest.

### 4.   Qualified immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Stanton v. Sims,* 571 U.S. ---, ---, 134 S. Ct. 3, 4-5, 187 L. Ed. 2d 341 (2013) (per curiam) (quotations and citations omitted).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law."  *Id.* (quotations and citations omitted).

In a § 1983 action, an officer is entitled to qualified immunity "only if (1) the facts alleged,

---

[13] In the hospital interview Plaintiff cites to in his opposition, he states that he heard the deputies' identify themselves as law enforcement, he heard the deputies shout "let me see your hands," yet he had no explanation for why he declined to comply with the deputies' request.  Brunner Decl. Ex. J.

taken in the light most favorable to the party asserting injury, show that the officer's conduct

violated a constitutional right, and (2) the right at issue was clearly established at the time of the

incident such that a reasonable officer would have understood her conduct to be unlawful in that

situation."  *Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1051-52 (9th Cir. 2014)

(citation omitted).  "Either question may be addressed first, and if the answer to either is 'no,' then

the officers cannot be held liable for damages."  *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th

Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  The undisputed evidence in

this case shows that the second question may here be answered in just that manner.

Plaintiff asserts that "the law on excessive use of force to effect and [*sic*] arrest is clearly

established," and that "[u]sing a police dog to attack an intoxicated and unresponsive person in

front of his own home, who posed no threat to the officers, is a clearly established use of excessive

force."  (Pl.'s Opp'n at 17.)  Plaintiff's assertion may be correct so far as it goes.  *See e.g.,*

*Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) ("The right to be free from the

application of non-trivial force for engaging in mere passive resistance was clearly established

prior to 2008.") (citation omitted); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994) ("[N]o

particularized case law is necessary for a deputy to know that excessive force has been used when

a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under

control.").  But, it does not describe the case at bar.

First, it is undisputed that Plaintiff had a metallic object in his hands at the time the

deputies encountered him.  Second, for reasons already explained, Plaintiff cannot rely on his

purported intoxication to oppose the instant motion.  Third, Plaintiff's characterization of this case

assumes that the deputies knew Plaintiff was sitting in front of his own apartment, a fact which

was indisputably unknown to the officers at the time of the incident.

As discussed above, the following facts are undisputed:  (1) Plaintiff was holding a

metallic object, (2) Plaintiff did not comply with the deputies' commands even after they warned

him that they would release the K-9, (3) Plaintiff saw the knee of a person and the police dog's

face, and (4) the deputies released the K-9 only after performing a use of force analysis in which

they considered and eliminated less intrusive means of force.  Taking the evidence in the light

United States District Court
Northern District of California

most favorable to Plaintiff, the deputies' use of the K-9 did not violate his Fourth Amendment right to be free from excessive force.  Even if it had, under the circumstances the deputies encountered, no reasonable officer could have believed that responding to a potentially armed suspect as the deputies did here was unlawful.

For these reasons, the deputies' are entitled to summary judgment on the basis of qualified immunity.

### B. State law claims

In his complaint, Plaintiff asserts claims under state law for assault and battery, violation of the Tom Bane Civil Rights Act, California Civil Code section 52.1, and negligence.

California Government Code section 815.2 provides:

> A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.

Cal. Gov't Code § 815.2(a).  Where, however, the employee is immune from liability, the entity is also immune.  *Id.* § 815.2(b).  A public employee "is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion [is] abused."  *Id.* § 820.2.  A public employee also faces no liability "for his act or omission, exercising due care, in the execution or enforcement of any law."  *Id.* § 820.4.  California Government Code section 820.8 further provides:  "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person.  Nothing in this section exonerates a public employee from liability for injury proximately caused by his own negligent or wrongful act or omission."

As discussed *supra* Part III.B.2, the deputies' decision to deploy the canine was reasonable under the totality of the circumstances.  This brings their conduct within the scope of the state law immunities asserted here.  *Cf. Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007) (defendant officers, relying on section 820.2, were not entitled to summary judgment on state law claims where there were genuine issues of material fact on the reasonableness of the officers' use of force); *Robinson v. Solano Cty.*, 278 F.3d 1007, 1016 (9th Cir. 2002) ("California denies immunity to officers who use excessive force in arresting a suspect.") (citation omitted); *Nelson v.*

United States District Court
Northern District of California

*City of Davis*, 709 F. Supp. 2d 978, 993 (E.D. Cal. 2010) (Discretionary immunity "does not protect tactical choices found to be unreasonable . . . .") (citation omitted); *Scruggs v. Haynes*, 252 Cal. App. 2d 256, 266 (1967) (discretionary act immunity did not apply where officer used unreasonable, excessive, unwarranted, and unnecessary force to effect an arrest).  This insulates the deputies from liability on Plaintiff's state law claims.  Because the individual deputies are immune, the County also faces no liability on these causes of action.  *See* Cal. Gov't Code 815.2.

Defendants are, therefore, entitled to summary judgment on the ground that they are immune from liability on Plaintiff's state law claims.

### IV.     CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

Dated:  09/24/2015

_____
KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California

23